IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LISA SEIPEL,

Plaintiff,

v.

OPINION AND ORDER

12-cv-00596-wmc

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.

Pursuant to 42 U.S.C. § 405(g), plaintiff Lisa Seipel seeks judicial review of a final administrative decision of the Commissioner of Social Security that Seipel was not disabled within the meaning of the Social Security Act. For the reasons set forth below, the court will remand the case to the Commissioner for further proceedings.

## FACTS[1]

### I. Background

On March 25, 2011, Administrative Law Judge ("ALJ") Sally Reason issued a decision denying Seipel's application for Disability Insurance Benefits ("DIB"). (AR 48.) Seipel filed a timely request for review of the ALJ's decision. On July 6, 2012, the Appeals Council denied Seipel's request for review, making the ALJ's decision the final decision of the Commissioner. (AR 1.) On August 16, 2012, Seipel filed a timely complaint for judicial review in this court pursuant to 42 U.S.C. §405(g).

[1] The following facts are drawn from the administrative record, which can be found at dkt. #10.

Seipel alleges disability based on physical impairments stemming from a roll-over automobile accident that occurred on December 11, 2006. (AR 43.) Due to the accident, Seipel sustained a displaced distal radial fracture on the right upper extremity, medial malleolar fracture on the distal portion of the right lower extremity (AR 254), fracture of the talar neck (AR 558), and a strain to the right hip. (AR 529.) Doctors performed an "open-reduction internal-fixation of the right wrist" (AR 560-61), "talar neck," and "medial malleolus." (AR 562-63.) After discharge from the hospital, Seipel continued to experience ankle pain that increased with movement and decreased with rest. (AR 576.)

Seipel's foot and ankle pain, as well as hip problems, have persisted to date. In order to alleviate the pain temporarily, Seipel must alternate between sitting, walking and elevating her leg. (AR 17.) Seipel is unable to sit for more than two hours at a time before she must stand and walk. (AR 24.) Seipel uses a cane to walk and to relieve the pressure on her hip and ankle. (AR 19.) She also takes the prescription pain medication, Vicodin. (*Id.*) Seipel is limited to working four hours a day at her fast-food job due to pain and swelling in her foot. (AR 22.) After work, Seipel must elevate her foot, applying ice to reduce pain. (*Id.*) Seipel is reliant on her husband for assistance with shopping and her children to complete household chores. (AR 21.)

## II. Relevant Medical Evidence

In December 2007, Seipel reported to her podiatrist, Dr. Andrew Pankratz, D.P.M., that she was experiencing pain and swelling in her right foot. She reported that pain increased when she worked. (AR 687.) Seipel's pain persisted into 2008, at which

point Dr. Pankratz ordered an X-ray that indicated mild flattening of the plantar arch, some sclerosis of the midpoint of the talus, as well as possible diffuse osteopenia. (AR 277.) Dr. Pankratz also diagnosed Seipel with sinus tarsi syndrome and degenerative joint disease of the hindfoot. (AR 275.) In 2009, Seipel reported to Dr. Pankratz that she was still experiencing "stabbing and knife-like" pain. (AR 287.) Another X-ray revealed partial fusion of the posterior talocaneal joint and presence of dystrophic calcifications. (AR 289.)

In June 2009, Seipel underwent a right ankle arthroscopy. (AR 300.) At a physical therapy evaluation following the surgery, Seipel described her ankle pain as ranging from an eight to a ten on a ten-point scale of severity. (AR 307.) Seipel's pain was reportedly aggravated by walking, standing, climbing stairs, pushing, pulling, lifting, carrying, and applying weight to the right foot. (AR 699.) In June 2010, Seipel underwent another arthroscopy and a postoperative X-ray indicated early degenerative changes, as well as a plantar spur in the right ankle. (AR 740.) At this time, Seipel resumed physical therapy and was prescribed a cane to assist with walking. (AR 703.) As of August 2010, Seipel was only able to endure four hours of activity before having to stop due to ankle pain. (AR 705.) As of 2012, Seipel had undergone a total of *four* ankle surgeries. (AR 258.)

Since the 2006 accident, Seipel has also continued to experience hip problems. A 2009 X-ray of her right hip revealed mild irregularity of the right femoral head with suspected subchondral cyst formation, and minimal superior joint face narrowing. (AR 292.) Doctors diagnosed Seipel with early degenerative arthritis and noted possible

avascular necrosis. (*Id.*) After a 2009 MRI revealed that the condition of Seipel's hip had worsened, her doctor determined that decompression of the right hip would not be of benefit because the weight-bearing portion of the femoral head had collapsed and she would eventually need a right hip replacement. (AR 294.)

**A. Dr. Robyn Sandin, M.D., Consultative Physician**

At the request of the Commissioner, Dr. Robyn Sandin, M.D., evaluated Seipel in January 2011. (AR 742-45.) Dr. Sandin observed that Seipel's ankle had a "decreased range of motion secondary to the fractures and surgery as well as pain." (AR 744.) Seipel's range of motion of the right hip was also diminished due to pain. (*Id.*) Seipel also walked with a slight limp favoring the right side, and while she did not use a cane in the exam room, she did use one while walking down the hallway of the examination office. (*Id.*) In addition to right hip and ankle pain, Dr. Sandin diagnosed Seipel as suffering from obesity and hypertension. (AR 745.)

Dr. Sandin concluded that Seipel would likely need ankle fusion surgery at some point, which would result in further problems with balance. (*Id.*) Seipel would also probably need to have a hip replacement and walk with the assistance of a cane for the rest of her life. (*Id.*) Overall, Seipel's prognosis for improvement was poor. (*Id.*) Regarding Seipel's ability to perform work functions, Dr. Sandin reported that she would need to change positions frequently and sit or stand whenever necessary to relieve her pain. (*Id.*) Dr. Sandin concluded that Seipel could continue to work at least part-time for four or five hours a day, but would need to take frequent breaks and should not

operate foot controls or climb ladders. (*Id.*)

**III. Administrative Law Judge's Decision**

The ALJ found that Seipel had not engaged in substantial gainful activity ("SGA") since her alleged onset date, June 24, 2009. (AR. 40.) The ALJ also found that Seipel had the following severe impairments: status post-fracture and open reduction internal-fixation of the right subtalar joint; status post-fracture and open-reduction internal-fixation of the right medial malleolus; avascular necrosis of the right hip; and obesity. (AR 41.) Still, the ALJ found Seipel had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a). (AR 42.)

Specifically, the ALJ determined that Seipel's RFC was limited to the following:

> . . . lifting up to 5 pounds frequently and up to 10 pounds occasionally, sitting up to 6 hours total in an 8-hour workday, and standing/walking up to 2 hours total in and (sic) 8-hour workday, with the following restrictions: she requires a cane for ambulation over uneven terrain and for long distances; she can only occasionally perform postural activities.

(AR 42.)

At step four, the ALJ determined that Seipel was unable to perform any past relevant work as a manager, food service worker or housekeeper. (AR 47.) The ALJ also noted that while Seipel was currently working part-time in food service, she would be unable to perform this job on a full-time competitive basis. (*Id.*) Turning to step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the

national economy that that claimant can perform." (*Id.*) Accordingly, the ALJ found that Seipel was *not* under a disability as defined by the statute.

**OPINION**

When a federal court reviews a final decision by the Commissioner of Social Security, the Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Even so, a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence. *See Ehrhart v. Secretary of Health and Human Servs.,* 969 F.2d 534, 538 (7th Cir. 1992). The ALJ must also explain his "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Id. See Herron v. Shalala*, 19 F.3d 329, 333–34 (7th Cir. 1994). When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Seipel challenges the ALJ's decision on four grounds, each of which is addressed below.

## I. The ALJ's Step 3 Analysis

At Step 3, an ALJ must discuss the listings considered by name and offer "more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *see also Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). An ALJ also has a duty to explain her analysis of the evidence with enough detail and clarity to permit meaningful review. *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012).

Here, while the ALJ found that Seipel's condition did not satisfy the requirements of any listed impairment at Step 3, she failed to outline what specific listings she considered. Instead, the ALJ referred generally to "the closest analogous listings for musculoskeletal disorders." (AR 42.) Presumably among those were Listings 1.02A, 1.03 and 1.06, which were discussed at the hearing and address the inability to ambulate effectively due joint dysfunction or reconstructive surgery, but the ALJ's broad statement fails to provide sufficient guidance as to which criteria the ALJ actually considered, much less why they were rejected. Even if the specific listings had been included, the absence of any meaningful discussion of *how the evidence* in the record supported the ALJ's findings would still merit remand. For example, while the ALJ noted that "[t]here is insufficient evidence of the requisite functional loss . . . among other things, to satisfy the requisites of any of these listings," she provided no explanation of *what evidence* she considered and how it was insufficient. (*Id.*) Without more, this conclusory assertion requires remand so the ALJ can explain how she reached her step 3 determination.[2]

[2] While the ALJ "need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion." *Arnett*, 676 F.3d at 592.

The ALJ also failed to adequately explain why she found Seipel's obesity did not result in extreme limitations required by the listings, when considered in combination with her other impairments. Since obesity may increase the severity of impairments to the extent that the combination of impairments meets a listing (SSR 02-1p), an ALJ "must factor in obesity when determining the aggregate impact of an applicant's impairments." *Arnett v. Astrue*, 676 F.3d at 593; *see also Martinez v. Astrue*, 630 F.3d at 698-99 (7th Cir. 2011) (characterizing a claimant's obesity as a severe impairment without discussing how it might affect other impairments was inadequate).

As with her other limitations, the ALJ's treatment of Seipel's obesity consisted of a single sentence stating simply that when her obesity was considered in combination with other impairments it did not result in any extreme limitations. The ALJ may well have had a sufficient basis to reach this conclusion despite finding Seipel severely obese and the seemingly likely impact of that obesity on other impairments to her hip and ankle joints the ALJ also found to be severe. Without discussing *how* she reached that conclusion or describing *what* evidence, if any, she relied on in doing so, the court has no basis to meaningfully review her analysis. Accordingly, the court finds that remand is also appropriate so the ALJ can provide an explanation of how she determined that Seipel's weight in *combination* with her other severe impairments did not place extreme limitations on Siepel's ability to work under step 3.

## II. Conclusion that Seipel Was Capable of Full-time Work

Seipel further contends that the ALJ erred in finding her capable of full-time work

based on her part-time work history.[3] In doing so, Seipel asserts, the ALJ also failed to consider adequately her inability to perform any kind of sedentary work given her severe limitations. Seipel testified that she works approximately 20 hours a week at her fast-food job and that this job requires her to constantly be on her feet. (AR 41.) Seipel testified that even working only four hours a day causes her foot to swell, requiring elevation and ice each day to reduce pain. (AR 22.) When Seipel is not working, she alternates between sitting, walking and elevating her leg. (AR 17.) She also testified that she can only sit for two hours at a time before she needs to walk around. (AR 22.)

While the ALJ was certainly permitted to consider Seipel's work status, this evidence must be calibrated against other evidence. *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 276-77 (7th Cir. 2010). Simply because a claimant has managed to endure part-time work, an ALJ may not summarily conclude that she must be able to engage in full-time work. *See, e.g.*, *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) ("there is a significant difference between being able to work a few hours a week and having the capacity to work full-time").

---

[3] The daily activities that Seipel performed at her part-time job were central to the ALJ's finding that she was not disabled:

> The claimant reported that her job at McDonald's requires standing and walking without sitting for four hours a day. The undersigned finds this work activity to be far more persuasive evidence of the claimant's functional capacity than her written statement and reports alleging a greater degree of limitation. Simply put, the claimant proved that she is capable of engaging in work activity by actually doing the same in employment for an extended period of months.

(AR 22.) While Seipel's part-time work served as a basis for finding that she could "perform a restricted range of sedentary work," the ALJ acknowledged that due to her physical impairments she could not be expected to continue working in her current fast-food job. (*Id.*)

In this case, the ALJ relied heavily on Seipel's current part-time employment, but failed to address how specific aspects of her impairments might limit her ability to work in a full-time, sedentary job. Based on nothing more than Seipel's being on her feet for four hours a day, the ALJ could not definitively conclude that she is able to work in a job where she sits most of the day. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Specifically, while the ALJ noted that many sedentary jobs would enable Seipel to sit or stand at will, there was no discussion of how her need to walk around and to elevate and ice her foot during the course of an eight hour day might impact her ability to work full-time, despite the ALJ's assumption that Seipel would be expected in a sedentary job to sit for six hours a day, while walking and standing for two. (AR 42.)

Here, Seipel struggles to sit for more than two hours at a time (AR 22), yet rather that exploring how Seipel's difficulty sitting for extended periods of time could limit her ability to work full-time, the ALJ chose to rely almost exclusively on the fact that Seipel has tolerated more strenuous work on a part time basis in finding she was "not disabled." *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 983 (7th Cir. 1999) ("Some disabled people manage to work for months, if not years, only as a result of superhuman effort, which cannot be sustained").

Accordingly, the ALJ's failure to examine, much less, how Seipel's limitations translate into a full-time setting, when combined with the problematic weight assigned to her part-time employment, is a further deficiency warranting remand.

**III. ALJ's Evaluation of Dr. Sandin's Opinion**

In her decision, the ALJ summarized Dr. Sandin's functional limitations opinion as follows:

> [Seipel] should have the ability to frequently change her position; she should be able to sit or stand when needed; she would require frequent breaks; she should not bear weight, lift, push, or pull more than 10 pounds at a time; she should not operate any foot controls or climb ladders.

(AR 46.)

On close inspection, the court finds the correlation between this opinion and the ALJ's formulation of Seipel's residual functional capacity of Dr. Sandin's report to be problematic at best. *First*, the ALJ's RFC contains no discussion of Seipel's *need to take frequent breaks*. In making an individual's RFC determination,[4] "an ALJ must offer good reasons for discounting a treating physician's opinion," and "may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest disability." *Campbell v. Astrue*, 627 F.3d 299, 306-07 (7th Cir. 2010). The reasons the ALJ presented for assigning little weight to Dr. Sandin's opinion amounts to just such a selective discussion. The ALJ chose to highlight aspects of Dr. Sandin's report that were *not* supported by the objective medical record, while neglecting to address highly probative evidence that Seipel needed to take frequent breaks. Since this evidence could have a significant bearing on Seipel's ability to work full-time, remand is also necessary to allow the ALJ to explain her reasons for discounting Dr. Sandin's opinion. *Richards v. Astrue*, 370 F. Appx. 727, 731, 2010 WL 1443893, at

---

[4] When determining an individual's RFC an ALJ must "evaluate all limitations that arise from a medically determinable impairment and may not ignore a line of evidence contrary to the ruling." *Eakin v. Astrue*, 432 F. App'x 607, 611 (7th Cir. 2011).

*3 (7th Cir. Apr. 13, 2010) (an ALJ "has a duty to solicit additional information to flesh out an opinion for which medical support is not readily discernible"); *see also Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) ("Failure to fulfill this obligation is 'good cause' to remand for the gathering of additional evidence").

*Second*, after inexplicably discounting certain portion of the opinion of the sole physician who evaluated Seipel's functional limitations -- the ALJ neither made further contact with Dr. Sandin for the purposes of added clarification, nor did she seek out an alternative expert. (AR 46.) Following the ALJ's decision to assign Dr. Sandin's opinion *little weight*, this inaction on the part of the ALJ constitutes yet another separate basis for remand, as does the fact that the ALJ specifically requested Dr. Sandin's evaluation following the hearing, expressing the belief that she lacked "enough information"[5] about Seipel's limitations to make a disability determination. (AR 28.) As a result, Dr. Sandin's opinion was the *only* evaluation by a consultative physician that the ALJ had to rely upon in making her findings. Having determined to afford little weight to the sole medical evaluation, the ALJ was essentially back to square one after the hearing: the ALJ was without an expert opinion supporting her conclusions of law and fact on Seipel's disability claim.[6]

---

[5] At the hearing, the ALJ expressed the need for an orthopedic evaluation to determine what Seipel's current functional limitations were. (AR 28.) It seems that this was motivated in part by a perceived conflict between Seipel's claimed limitations and her part-time work record. (*Id.*) Dr. Sandin conducted the requested evaluation following the hearing and then provided the ALJ with the report she discussed in her findings of fact.

[6] This also raises the question whether the ALJ's decision is based upon substantial evidence. *See*, *Richardson*, 402 U.S. at 401. On remand, Dr. Sandin (or an alternative expert) should be asked to develop a record of the medical evidence that would serve as the basis for determining Seipel's current orthopedic limitations. An effort should also be made to develop a record as to why her current

Accordingly, the ALJ should have made every *reasonable* effort to re-contact Dr. Sandin for clarification, especially if the bases for her opinion were unclear. After seeking this clarification, the ALJ still found Dr. Sandin's opinion was unreliable, but chould have engaged a different expert to provide an alternative evaluation. These deficiencies should be reconsidered on remand. *See*, SSR 96-5P; *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004).

**IV. The ALJ's Evaluation of Seipel's Credibility**

Credibility is typically the province of the ALJ. *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000). An ALJ's credibility determination is "afforded special deference" because the ALJ is in the best position to see and hear the witness and determine credibility. *Id.* The court will only overturn an ALJ's credibility determination if it is "patently wrong." *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir. 2003). Given that the preceding three issues require remand, the ALJ may find that Seipel's credibility is bolstered once these issues have been properly addressed. Because of this, the court will decline to rule on the ALJ's credibility determination at this time.

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying plaintiff Lisa Seipel's application for disability benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g)

---

limitations might appear to be inconsistent with certain aspects of the objective medical evidence and Seipel's part-time work-record.

for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 1st day of May, 2014.

BY THE COURT:

/s/

_______________________________________

WILLIAM M. CONLEY
District Judge